New Jersey Department of Labor,
Workmen's Compensation Bureau.

DANIEL J. CHAPMAN, PETITIONER, v. VALLEY DINER, RESPONDENT.

For the petitioner, *Nathan Rabinowitz*.

For the respondent, *William P. Braun*.

The above matter coming on for hearing, and having been submitted to me for decision, I hereby find and determine as follows:

1. That this is a proceeding brought by Daniel Chapman and against Valley Diner, under an act entitled "An act prescribing the liability of an employer to make compensation for injuries received by an employee in the course of employment, establishing an elective schedule of compensation and regulating procedure for the determination of liability and compensation thereunder," approved April 4th, 1911, and the acts amendatory thereof and supplemental thereto; that a petition was filed December 11th, 1946, with the Workmen's Compensation Bureau; that copy of said petition was served on the respondent; that answer was filed with the said Bureau on January 10th, 1947; that due notice of hearing of said petition and answer was given to the respondent; that trial was had; that said trial was held in the presence of Nathan Rabinowitz, attorney for petitioner, and William P. Braun, attorney for respondent.

Two grounds are urged by the respondent as a defense to the above entitled claim petition. The first ground advanced by the respondent, is that petition was prematurely filed. I am of the opinion that this defense is without merit for the reason that it was not made at the time of filing of petition, but long after such time and after the matter had proceeded to trial, and long after the petitioner had ceased his medical treatment and when whatever permanent effects resulting from the alleged injury were manifest and readily ascertainable. The second ground urged by the respondent for dismissal of the above claim petition is that the petitioner has failed to prove the difference between an injury and a compensable accident.

The following facts are shown by the evidence:

On November 12th, 1946, the petitioner was employed by the respondent as a night manager of a lunch wagon and

diner. His duties consisted of cooking, short order cooking, and waiting on customers; his hours of employment began at four o'clock in the afternoon and lasted until two o'clock in the morning. He had been performing this work for the respondent for a period of six years, receiving a wage of $50 per week.

On the evening of the day in question, the regular dish washer, one Charles Gibbs, did not report to work because of illness, and the duties usually assumed by Gibbs, that of dish washing, were taken over largely by the petitioner; on various occasions on the evening of the day in question during his tour of employment, it was necessary that the petitioner take a tray or a metal basket containing dishes from the counter of the lunch wagon proper and carry the tray a distance of twenty or thirty feet to a backroom or a kitchen where a dish washing machine was situated. It appears that this dish washing machine is worked by electric motor; the top part or lid, which originally operated automatically, was in disrepair; and that in order to use the dish washer, a makeshift block and fall hoist was constructed by the employer, making it necessary to pull a rope which would, in turn, lift up this iron metal lid on top of the dish washing machine.

Now, there has been testimony that the lid, or top of the machine, weighed approximately 200 pounds, but I am satisfied—there have been pictures or photographs introduced in evidence showing this dish washer and makeshift block and fall hoist—that the pound pressure required of petitioner in raising the lid was much less than 200 pounds by the operation of the block and fall. By the elementary laws of physics, when weight is raised by means of a block and fall, the pound pressure is considerably less than where one lifts the same weight from the floor with both hands. So I am satisfied there was no 200 pound exertion expended by petitioner in operating the hoist but much less.

There was an engineer produced on behalf of the respondent, Ralph E. Hobbis, who testified that the pressure pull would vary, as I recall his testimony, between eighteen and twenty-five pounds in operating this particular hoist.

The petitioner testified that he had performed several of these operations of carrying the dishes to the dish washing machine during the course of his nightly work, and that about nine or nine-thirty in the evening of the day in question, he was pulling the rope to raise up the metal top of the dish washer to slide in some soiled dishes when he was seized with a severe attack of pain across his anterior chest. Petitioner described the pain as "knife-like" in character. He further testified that the pain lasted all night and that he had a heavy tight feeling. When he would breathe "I felt like I was getting a cold." He further testified that he began to sweat, and that a pain was present in both shoulders radiating down to his fingers; the testimony further shows that the petitioner still had several hours to go, and that he continued to work, but under difficulty for the balance of his evening's tour of employment. He testified that at times he was so weak that he laid with his head resting on his arms on a counter. He further testified that he had difficulty in closing up the establishment and getting the place in order, and that instead of closing at two A. M. he closed at four A. M., two hours beyond the regular closing time. He further testified he then drove home in his car, but that he "felt terrible," holding one hand on his heart and driving with the other hand. Upon arrival at his home, he was barely able to get into his house and fell across the bed with his clothes on. His pain was bad and his breathing was difficult, and his wife helped him to undress and get into his bed. He was unable to sleep all that night and slept on and off because of pain. At six A. M., Dr. John Cremens was summoned and the petitioner was referred to Dr. James E. Phelps for an electrocardiogram, and thereafter Dr. Cremens treated him several weeks at home for a coronary condition, and then later at his office. The petitioner testified that he never fully recovered from the effects of this occurrence and that he has never returned to work, and that he is unable, at the present time, to work.

There has been much controversy of late arising in heart cases, involving coronary lesions, as to whether or not, in order to prove a compensable accident, it must be shown that

the act of exertion was unusual, something out of the ordinary; and I refer now to a recent Court of Errors and Appeals case of *Lohndorf* v. *Peper Bros. Paint Co.*, 52 *Atl. Rep.* (*2d*) 61. In a well reasoned opinion, Mr. Justice Heher, who concurred in the result, reviewed the many cases dealing with heart conditions due to strain, both here and abroad, and this is what he says, referred to a wealth of English cases (at *p.* 62). That opinion reads in part as follows:

"An accident"—and now he is referring to these old English cases—"An accident may be 'something going wrong within the human frame itself, such as the straining of a muscle or the breaking of a blood vessel.' The term is to be taken in its ordinary and popular sense. In considering whether it was an accident which arose out of the workmen's employment, he deemed it"—of course, referring to the eminent English jurist—"he deemed it of no importance that 'there was no strain or exertion out of the ordinary.' An accident, he said, 'arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree or exertion or the condition of health.' He found the test to be whether the work, 'as a matter of substance, contributed to the accident.' He continued: Did the workman die from the disease alone or from the disease and employment taken together?"

So, in the present case there is no point to the respondent's contention of no accident because Chapman had previously operated the hoist without difficulty or ill effects.

From the evidence there appears an unbroken chain of events all of which establish a cause and effect between the act of exertion by the pulling of the rope of the dish washing machine on the evening of the day in question and his present condition. The employer of the petitioner testified that the latter had been a good worker and that he had worked for him for six years, having had very little time off by reason of injury or illness.

This case is not easy of solution because eminent doctors, who stand high in their profession and for whose opinions I have the greatest respect, are in such sharp conflict on the question of causal relationship. It is very difficult to decide

because of this reason, since there appears the most unusual diversion of medical opinion in this case.

It seems to me that a case of this kind should not be decided merely upon certain laboratory tests such as X-rays, electrocardiograms or encephlograms. Those tests are used largely to confirm, and when they are positive they are diagnostic and corroborative, but when they are negative they do not rule out entirely the existence or non-existence of a condition. Victims in the old days with coronary conditions suffered disability and died, and while there were no such things as ekgs, coronary lesions were diagnosed then upon clinical findings alone.

I am satisfied from the great weight of medical opinion that the ekgs in this case are negative, but what does that mean? Does it mean that he has failed in his proofs because electrocardiograms disclose negative and not positive findings? I don't think so. The essential factor, in my opinion, is the clinical picture which is far more important than the ekgs.

It seems to me that the petitioner has shown that on November 12th, 1946, he did suffer an accident which transformed him from a working unit to a condition of semi-invalidism. There is a lack of harmony on the part of the several medical experts as to the nature of the coronary attack, that is as to whether or not the petitioner suffered an angina of effort, a coronary spasm, or a coronary sclerosis. It was further in dispute as to whether perhaps the petitioner had a coronary insufficiency, a coronary thrombosis, or a coronary occlusion, in other words, six different medical terminologies. As a matter of fact, in my opinion, it makes little or no difference as to the character of the initial attack so long as it sets in motion certain coronary changes resulting in permanent myocardial damage.

I believe that the most important factor in this case is the history and clinical findings prior to the evening of the day in question. The petitioner was a working unit and a manager of a diner. To-day he is an invalid from no apparent cause other than the accident.

The respondent's medical experts, Dr. James C. Kaufman, and Dr. James E. Phelps offered no explanation for this marked change in the petitioner. On the other hand, the testimony of the treating physician, Dr. John Cremens, is convincing. While it is true that Dr. Cremens is not a specialist in cardiac diseases, there is no statutory rule that a heart lesion must be treated by a heart specialist. Dr. Cremens was engaged to treat the petitioner because he was the family physician and, in fact, has treated many cases of coronary occlusion. He diagnosed the petitioner's condition as one of coronary occlusion with infarction. Dr. Cremens testified he was summoned at six o'clock in the morning on November 13th, 1946, and that the petitioner still presented symptoms of some coronary condition. Dr. Cremens treated the petitioner at his home where the latter was in bed most of the time between November 13th, 1946, and January 22d, 1947, and thereafter treated him at his office. Both Dr. Cremens and Dr. Julian Cohen, a heart specialist, produced by the petitioner, were of the opinion that the petitioner suffered a heart lesion as a result of his unusual effort during the evening of November 12th, 1946. If this petitioner had been at rest, or had been sitting down doing nothing on the evening of the day in question, and he suddenly had developed a coronary episode, there would be no doubt in my mind that the disease followed a natural cause, but the petitioner under the undisputed testimony, was doing something. He was performing a physical act. He was doing something at the time that required physical exertion. It is true, it might not have been a great exertion, but it was great enough to be the cause of a heart lesion, which he suffered and which precipitated that lesion into motion. Dr. Phelps, one of the respondent's experts, on cross-examination, admitted that if an angina of effort lasts very long, such an attack may cause coronary insufficiency followed by damage of the heart muscle. Under the evidence in this case, this was a pretty long angina of effort and assuming that such was the character of the attack, this attack has had no end and on that very admission, there might well be a cause of the factor in setting up and producing the petitioner's disability.

The respondent raised the question of notice of the injury. Our statute does not prescribe notice of an accident. The claim petition for compensation was filed within thirty days of the accident, and hence such notice of injury was had by the respondent within the statutory time limit. I find from this point that the wife of the respondent admitted that she learned of the petitioner's having suffered a heart condition from her husband on November 13th, 1946, on the day following the accident.

In passing upon another question as to whether Dr. Cremens' treatment was authorized, I find that our statute very wisely provides that the employer shall be liable for emergency treatment. There is no doubt in my mind that this was a case of emergency treatment, and I so find. Under the circumstances I hold that the petitioner was relieved from seeking authorization from the respondent to engage any particular physician.

While Dr. Phelps and Dr. Kaufman, appearing for the respondent, diagnosed petitioner's condition as one of angina pectoris, unrelated to his employment, neither of these experts expressed any opinion as to the petitioner's permanent disability, regardless of the cause.

On the other hand, Dr. Cremens, the attending physician, testified that in his opinion a causal relationship existed between the effort of pulling the lid of the dish washer and the symptomatology which followed. Dr. Cremens believed that the petitioner's disability was permanent in nature and evaluated the same as between 70 and 75% of total. He further testified that his bill for medical services rendered the petitioner was in the amount of $60. Dr. Samuel Kleiner, testifying on behalf of the petitioner, stated he believed the petitioner suffered a coronary infarction, and subsequent damage to the heart, Dr. Julian Cohen, a heart specialist, also testifying for the petitioner, was of the opinion that the petitioner had suffered a coronary occlusion. He also believed that the effort expended by the petitioner on the evening of the day in question was responsible for such coronary occlusion with myocardial infarction, and believed petitioner's

disability to be permanent, and that he was disabled to the extent of 70 to 75% of total.

After weighing all of the evidence, I believe that the petitioner is entitled to a temporary disability for a period of 10 1/7 weeks, and permanent disability equivalent to 35% of total.

It is, therefore, on this 2d day of September, 1947, ordered that judgment be entered in favor of the petitioner.

JOHN J. STAHL,
*Deputy Commissioner.*